DANIEL KILLINS, (ALIAS DANIEL WILLIAMS), PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

HOMICIDE.—Evidence, restricting argument, repeating charges.

1. In a trial for murder, where the defendant, immediately after slaying the deceased, proceeded to shoot at, chase, threaten and endeavor to kill the mother of the deceased who was present and witnessed the killing, such subsequent threats and acts of the defendant are admissible in evidence as part of the *res gestæ*, and to show the *animus* of the defendant.

2. In the argument of any cause to a jury, it is improper for counsel to state facts that are not pertinent to the case on trial, and as to which there is no evidence; and, upon objection being made thereto, it is proper for the court to restrict the argument to the evidence in the cause.

3. Where the court has already fully instructed the jury upon the law of the case, it is not error to refuse a request to give other charges, couched in different language, but that are in substance nothing more than a repetition of those already given.

Writ of Error to the Circuit Court for Orange county.

The facts of the case are stated in the opinion of the court.

*J. M. Cheny* and *J. M. Lane* for Plaintiff in Error.

I. The court allowed the witness, Nancy Powell, to testify that after the shooting of Margaret the prisoner chased and shot her.

The alleged killing was done previous to these acts, hence they could not tend to show premeditation as to the killing.

II. (a.) The above applies to the evidence of William Ray, tending to prove similar facts.

(b.) The court erred in allowing William Ray to testify as to statements made to Killin's by a third person. The statement was no part of the *res gestæ* and was made by a stranger with no knowledge of the facts

so far as the evidence shows. It was well calculated to influence the jury when put before them, contrary to the objection of defendant's counsel.

III. The court erred in restricting argument of counsel. The statements of counsel were purely argumentative and for the purpose of illustration. The facts stated were not such as tended to prove the guilt or innocence of the prisoner even if accepted as true by the jury. The jury could have understood the import of the language used in no other way than as an illustration. The effect of stopping counsel in the midst of his argument and striking out the portion objected to which bore on a vital point of the case, viz : Identity, could not fail to influence the jury. On the question of identity counsel had the right to use any illustration so long as his statements would not have been evidence if given from the witness box and illustrated fairly his contention, or so long as the language used would not have a tendency to prejudice the finding of the jury. Thompson on Trials, secs. 965, 966, 967 and 968; Tucker vs. Henniker, 41 N. H., 317-332; Brown vs. Swineford, 44 Wis., 282-293; Hatch vs. State, 8 Tex. App., 416-423; Cross vs. State, 68 Ala., 476-484.

Counsel calls attention between the clear distinction between statements made as to facts which would have been competent as evidence and mere statements which could not prove or disprove any issue in the case and

used simply to illustrate an argument. The former would clearly be objectionable while to prohibit the latter would be a dangerous interference with freedom of speech and a full and liberal argument.

IV. (a.) The court erred in refusing to give the first charge prayed by the defendant.

(b.) The court erred in refusing to give the second charge prayed by the defendant.

(c.) The court erred in refusing to give the third charge prayed by the defendant. The evidence would have justified a verdict of manslaughter in the third degree if the statute of limitation had not run. The evidence tended to prove the killing, in January 1887, while the indictment was filed Oct. 1890. The court is not bound to instruct the jury on degrees of crime lower than charged in an indictment when the evidence would not fairly warrant a verdict for such lower degree. In this case the inference is strong that the fatal shot was fired under the sting of the tongue of a woman who knowing that Killins was angry, excited his jealous rage by taunting him in the presence of the entire camp, with his inability to have her the same as he had her mother and then after one shot had been fired flaunted her back to him and dared him by telling him to shoot again. It is unreasonable to presume that with the whiskey furnished him by Nancy Powell, with smart of the woman's words and actions well calculated to produce a heat of passion in such a man, that in an instant his passion became uncontrolable and

that the fatal shot was fired on the impulse and in the fury of the moment.

The evidence tending to show that the prisoner "chased the old lady" and shot her (if that evidence be deemed admissable by the court) tends to prove this theory, and the principle witness testifies that the instant he was checked, the prisoner said to the man who demanded his pistol: "Jake, I have done wrong, I have done wrong." If then the evidence (without the question of limitation) would have authorized the jury to render a verdict under sec. 11, page 352 McClellan, then we submit that the third instruction prayed by the defendant should have been given by the court. The defendant is entitled to a charge covering the entire law of the case.

This principle is admitted. 19 Fla., 872-889 and citations. Fully discussed in Thompson on Trials, sec. 2322 and citations.

V. The court erred in refusing to give the eleventh charge prayed by the defendant. It is the duty of the court to instruct the jury "in plain English, and avoid as far as possible the use of technical terms, especially of technical legal terms." Thompson on Trials, sec. 2327 and citations; Clark vs. Kitchen, 52 Mo., 316.

The charge as requested was plain in its terms and its refusal was not covered by the instruction couched in technical legal terms, numbered 8, of charges given by the court.

*The Attorney-General* for Defendant in Error.

The objections made by counsel for plaintiff in error to the testimony of William Ray and Nancy Powell, which was additted by the court, were not tenable.

They were part of the *res gestæ* and therefore admissible.

This testimony explained and characterized the act of plaintiff in error in the shooting of Margaret Welton. Hodge vs. State, 7 So. Rep., p. 593.

The argument of Mr. Cheney touched upon matters not in evidence and that had no connection with the case. It was the duty of the court to correct him and rule that part of his argument from the consideration of the jury. Newton vs. State, 21 Fla., p. 53.

Charges Nos. 1, 2 and 3, prayed by counsel for plaintiff in error in the court below, were abstract charges, had no relevancy to the case and did not in any way apply to the facts testified to on the trial and were properly denied by the court. Hicks vs. State, 25 Fla., 535.

Charge No. II, requested by counsel for plaintiff in error, had already been fairly given by the 8th paragraph of the courts original charge. This court has decided too often for reference, that in such cases the trial judge need not repeat his charge merely changing the phrase. Reddick vs. State, 25 Fla., 112.

The motion for a new trial was properly overruled.

The evidence established fully the identity of de-

fendant below, and the testimony of the witnesses showed that he committed and unprovoked murder.

TAYLOR, J. :

On the 29th of October, A. D. 1890, Daniel Killins, alias Daniel Williams, was indicted in the Circuit Court of Orange county, Seventh Judicial Circuit, for the murder on the first of February, A. D. 1888, of one Margaret Welton; the weapon used being a pistol. On the 16th of April, 1891, the defendant was put on trial, and was convicted of murder in the first degree as charged in the indictment. Motion for a new trial was made upon the following grounds : "1st. Because the verdict was contrary to the evidence; 2nd. Because the verdict was contrary to the law; 3rd. Because the verdict was contrary to the law and the evidence; 4th. The court erred in not giving the first charge asked for by the defendant; 5th. The court erred in not giving the second charge asked for by the defendant; 6th. The court erred in not giving the third charge asked for by the defendant; 7th. The court erred in refusing to give the eleventh charge prayed by the defendant." Which motion was denied, and the defendant sentenced to die; from this judgment and sentence the defendant appeals to this court.

The errors assigned are as follows : "1st. Court erred in allowing the witness William Ray to testify contrary to the objections of defendant's counsel; 2nd. The court erred in allowing the witness Nancy

Powell to testify contrary to the objections of defendant's counsel; 3rd. In restricting argument of counsel J. M. Cheney; 4th. In refusing to give the first charge prayed by defendant; 5th. In refusing to give the second charge prayed by the defendant; 6th. In refusing to give the third charge prayed by the defendant; 7th. In refusing to give the eleventh charge prayed by defendant; 8th. In refusing to grant a new trial.

The errors assigned necessitates some discussion of the evidence. Nancy Powell, for the State, testified that she knew the prisoner, and had known him intimately since 1886; that she came to Florida from Georgia with the defendant in 1885; that the deceased, Margaret Welton, was her daughter; that Margaret Welton was then in her grave; that the prisoner put her there; that she and the prisoner were living together, though she was not his wife; that she and the defendant and her daughter, the deceased, were at the time camping out in a tent at Oakland, in Orange county, Florida. The defendant's occupation was that of getting out railroad ties; that on one evening in January, 1887, one Jake Allision, who also came with her from Georgia, came to her tent and asked her to keep his coat there for him; she told him to put it in the tent, which he did. The defendant concluded not to go out that evening to his work of cutting ties, but staid in the tent. Feeling tired, she went in the tent and laid down. Not thinking of it, she did not look in Jake Allison's coat pockets for any pistol. After getting his supper ready, she sent for the defendant to come to

supper.  He did not come at once, but came after awhile and said:  "Nancy, where is that whiskey I told you to get for me this evening?"  I told him to look in that box and get it.  He came in there cursing, saying G—d d——d if he was not going to kill two niggers that night.  I then thought of my money, as I had one of those fifty-cent baking powder cans full of silver dollars in my trunk.  He came in and threatened and cursed me, and kicked me in the side as hard as he could. · It was ever so long before I could straighten, and when I did I hallooed; my daughter ran to me and said, "what is the matter?"  I paid no attention to her, but said to him, "what in the name of the Lord did you kick me for?"  He replied, "what have you been saying about me?"  I told him I had said nothing about him; he then cursed me again.  My daughter then spoke and said, "my mother was no bitch; that it was no more than she would be if she did what he wanted for him."  I did not know he had the pistol.  She jumped from against the tree and whirled, and he shot; I think he struck her in the back; it was so quick I could not tell exactly where she was shot.  I threw up my hands and said, "don't kill my daughter; if you kill my daughter kill me too," and then he turned on me and I broke and run.  When I went I saw that he was intending to kill me too; I whirled and he shot me right in the small of the back.  I said, "Lord, man are you going to kill me too?"  I ran about two hundred yards or more to where there was a light; he followed me over there; I looked back and

saw him coming; I said, " don't kill me;" he said, " I am going to shoot you like I want to shoot you; I want to shoot the heart out of you." Then a man walked up and said, "Dan, give me my pistol; what in the name of God are you studying about, shooting around here?" He said, " Jake, I have done wrong, I have done wrong." My daughter stayed only three weeks after I brought her from Georgia; she did not live quite three weeks. I am certain that the prisoner is the man. Oakland is in Orange county, State of Florida. I did not see Margaret Welton after she was dead, because I was nearly dead myself. The last I saw of her was when he shot her. I was in the tent when the shooting took place; I was standing in the tent looking at him when the shooting took place; my daughter was standing thirty or forty or more feet off by a pine tree. The prisoner had placed himself on a cross-tie about ten steps from her when he shot her. The shooting did not take place in the tent. He walked out after kicking me and placed himself on a tie. The coat in my tent was Jake Allison's; there was a pistol in the pocket of Jake Allison's coat; I was taking care of it for him; the pistol was a " thirty-two;" Jake brought it down from Georgia when he came down with me. Didn't know how old he was; 20 or 30, along about there; my daughter was going on seventeen years old. There had never been any trouble between defendant and me about my daughter; have had a heap of trouble with defendant; had trouble with him all the time. I was not married to him, but he had me in such a way here

I was afraid all the time. I went back to Georgia in 1886, and came back here because he told me if I did not come back he would kill me. The defendant was very jealous of me, and would jump on me if he saw a man around there, or if he saw tracks around the tent. It was Jake Allison's pistol that he did the shooting with.

Joe Hollingsworth, for the State, testified that he knew the prisoner, and pointed him out; had known him for four or five years; he also knew the deceased, Margaret Welton; that she was dead; I saw her when she was shot. This man (indicating prisoner) shot her. I was sitting out in front of the tent one evening about six o'clock and Miss Smith, (she was then,) that woman that was up here, and Dan came in a few minutes afterwards, and they had a row. Margaret came down and asked what was the matter. The old lady told her Dan had kicked her. She then said "the first thing you know Dan will kill you," and then she and Dan got to quarreling. She said, "you are mad at me because you can't have me and my mother both;" then Dan shot at her and missed her, and the next shot struck her in the back. This is the man that did the shooting; am certain of it; he shot her twice, missed her first time. He was eight or ten feet from her when he shot her; she turned off when he shot; told him to shoot again, and he shot, as she said, the second time, and killed her. This was in 1887, some time; can't tell the time of the year. It was at Oakland, in Orange county, Florida; am no relation to Nancy

Powell. I was sitting about five feet from him when he shot, looking at him. The shooting took place a good while after she came down and her mother had said that Dan had kicked her. It was a good while after—five or ten minutes or so. She and Dan were quarreling because Dan kicked her mother. Nancy was crying at the time, in the tent. Nancy was in the tent when the shooting took place, but ran out when he shot. I have not seen Dan until now since he did the shooting.

Aaron Kirby, for the State, testified that he knew the defendant, and pointed him out in court; that he had known him about six years; had worked with him cutting ties for two railroads, occupying the same camp with him. Knew Margaret Welton; she is dead; saw her after she was dead at Oakland, about a mile from town. I saw what killed her. The question was between Dan and the girl. The girl came up there when Nancy Powell was screaming, and asked her mother what was the matter with her; on her mother telling her that Dan had kicked her, she said, "I told you to come away from Dan." Dan replied, "your mother accuses me of so many low acts and she never has caught me in any." She replied, "my mother has caught you in a heap of low acts." Then he said to her, "if you don't hush I will blow your brains out;" then she turned around, and as she turned around he shot, and the ball lodged right here (indicating) in the back. I am certain that this is the man; he is the man that did the shooting. It was a 32

pistol; he was about ten steps from her when he shot her. The girl was standing by a little fire. I don't think she lived five minutes after being shot. It was in January, 1887, when he did the shooting. The girl and Dan were not doing anything at the time of the shooting; they had a dispute; it was after dark. J. C. Rings and Hollingsworth were there; we were all there in a crowd together. There were no trees where this camp was except some pines and small oak bushes. I worked with Dan Killins, at Bartow, for about six months. I know Joe Hollingsworth; he was down there at the time. When the shooting took place it was dark enough to build a fire out doors for the light. I saw the shooting myself. Nothing was done after the shooting that I know of. I left there after the girl was dead; and I never saw Dan Killins after the shooting.

William Ray, for the State, testified that he knew the defendant, and pointed him out in court; I worked with him on a railroad and at Oakland on a farm; saw him every day and night. I knew Margaret Welton; she is dead; I saw her after she was dead; I was not right there when she was killed; was at a little distance; I came up when he was chasing the old lady; I heard the shooting, and that was why I went there; I was a short distance off, and at the first pistol fire, I started, and the time I got there the old lady was running; she ran into the tent of a man named John Taylor; John Taylor ran out with a mus-

ket, and then Dan said, " G—d d——m her soul, I will kill her." Taylor said, "well, if you kill her, you will not kill her in my tent; you will not go in there after her." He walked off, and a man went to him and said, "you have killed that woman; she is dead;" the man then told him, "you had better be trying to get out of the way." Then he went to the man the pistol belonged to and gave it to him; that is the last time I have seen him. A doctor by the name of Rush was sent for, and he came. I held the light for him to probe for the ball. I suppose Dr. Rush got there about an hour or three-quarters after the shooting. I was there cutting ties for the Orange Belt railroad; when I heard the shooting I was standing off a distance of about from here to the street; I saw nothing till I went there and saw him chasing that woman; I have not seen him since he left that night. I know Nancy Powell. The shooting took place about the first of the night. There were small oak bushes and pine trees where the camp was; there were pines very near the tent. Nancy lived with Dan Killins at the time of the shooting. Immediately preceding the shooting I had been with Killins about a year, off and on. Margaret Welton had not been there very long before she was killed.

The name of the next witness for the State is omitted from the record, but his testimony is as follows, and indicates that he was the Dr. Rush spoken of above:

He testified that he was a practicing physician; that he was called to see Margaret Welton in January, 1887; he found her rigid in death; at the inquest held over her I examined as to the cause of her death; I found that the ball had penetrated between the 7th and 8th rib, to the left of the spleen about one and a quarter inches, and struck the sturnum between the 8th and 9th rib, passed through the nerve, through the liver, the lung and the heart; a mortal wound; it certainly was sufficient to produce death. This was in January, 1887; I neglected to look at my day book; I think about the 9th of January, as near as I can recollect; it was in Orange county, Florida, about three-fourths of a mile from Oakland. I knew a man by the name of Dan Killins. A great many of them there were diseased, and I was there every few days. Ed Powell was the only one that I paid much attention to to know; I saw a man there that looked very much like Dan Killins here; there was a man just like him living there; he wore a mustache, and his mustache was rather long and straight for a colored man; one day one of them called my attention to him, and I was told to look out for him; that is why I noticed him, that I might know him, and when I noticed him there was something the matter with his mouth; I notice a similarity to it about the prisoner's mouth; there is a mark; he looks very much like that man; that mark seemed to be on the left side when he was there, and it seems to be there

now.    I could not say positively that this man here is Dan Killins, but it looks very much like him.

Wade Scraggs, for the State testified that his occupation was railroading as a general thing; he knew the prisoner; he worked for him on the T. A. & G. raiload for some four months; his name was Dan Killins; the prisoner is the man that worked for me, to the best of my knowledge.    I knew a woman that he had there that he said was his wife.    It is my positive opinion that that is Dan Killins; I suppose he worked for me three or four months; he cut right of way and some ties; I know him by his looks; he has a mark on him that Dan Killins had on him; a mark right in the centre of his lip; a scar, you will see the same mark on him; I do not recognize him by that altogether; I recognize him by color, size, etc.

No testimony was offered for the defendant except his own statement under oath to the effect that he was there accused of something that he was not guilty of. That at the time they said this crime was committed he was at McRae, in Georgia, cutting some sills for a colored man by the name of George Ellison, and that he cut his foot then hewing at the sills; his left foot, and could not work any for two or three weeks.    I completed the sills and went from there to cutting ties for Mr. John E. McRae; that he had never been here before until he was arrested and brought here; that he knew nothing about these people; no more than a man that was never born; that they had got him here on an

unjust cause; and had taken him from his wife and little children; that his wife was confined about three or four weeks after the date that they said that this crime was committed; that it looked mighty strange that a man would be as cross as she says I was with her, and there is my wife there, and God knows that we get along like two children together—never have a cross word.

The court charged the jury as follows: 1st. The killing of a human being without authority of law by poison, shooting, stabbing or any other means, or in any other manner, is either murder, manslaughter, or excusable or justifiable homicide, according the facts and circumstances of each case.

2nd. Such killing, when perpetrated with a premeditated design to effect the death of the person killed, or any human being, shall be murder in the first degree.

3rd. Homicide is justifiable when committed in resisting an attempt to murder the person who does the killing, when committed in the lawful defense of one's person, or his or her husband, wife, parent, child, master, mistress or servant, when there shall be reasonable ground to apprehend the design to commit a felony, or to do some great personal injury, and there shall be imminent danger of such design being accomplished.

4th. If the jury believe from the evidence, beyond a reasonable doubt, that the defendant Daniel Killins, alias Daniel Williams, in the county of Orange and State

of Florida, at any time prior to finding the indictment, from a premeditated design to effect the death of Margaret Welton, did shoot the said Margaret Welton and did inflict upon her a wound in her back, as alleged in the indictment, and that the said Margaret Welton died from the effects of such wound as alleged, and that such killing was unlawful, and not justifiable or excusable, you will find the defendant guilty as charged in the indictment.

5th. If you do not so believe you will find the defendant not guilty.

6th. In cases where the punishment is death, if the jury find the defendant guilty, a majority may recommend the accused to the mercy of the court, which will reduce the punishment from death to life imprisonment.

7th. The law does not prescribe what length of time should elapse between the formation of the design to kill and its execution to constitute premeditation. It is sufficient that there was a fully formed purpose to kill with enough time for thought to convince the jury that the mind of the prisoner had become fully conscious of its own design. Premeditation is defined as meaning intent before the act, but not necessarily existing any extended time before the act.

8th. The jury are the sole judges of the weight of the testimony, as well as the credibility of the witnesses.

9th. The presumption of the law is in favor of in-

JUNE TERM, 1891. 331

D. K., alias D. W., v. The State of Florida.—Opinion of Court.

nocence, and you will give the prisoner the benefit of every reasonable doubt as to his guilt.

The following charges at the request of the prisoner were also given : 4th. If, the jury find that the alleged killing was done two years previous to the filing of the indictment, and that such killing was an involuntary act, and not committed by means cruel or unusual, in the heat of passion, then your verdict should be not guilty.

5th. If the jury find that Margaret Welton was killed by some person as charged in the indictment, but have a reasonable doubt as to the identify of the person doing the killing and the prisoner being the same, then your verdict should be not guilty.

6th. If the jury have a reasonable doubt of the idenity of the prisoner at the bar with the person doing the alleged killing, then your verdict should be not guilty.

7th. If from the evidence, the jury have a reasonable doubt as to the prisoner having inflicted the wound which caused the death of Margaret Welton, then your verdict should be not guilty; the prisoner is entitled to every reasonable doubt.

8th. If the jury find that the prisoner committed a less offense than murder in the first degree, as charged in the indictment, and further find that such offense was committed more than two years previous to the

filing of the indictment, then your verdict must be not guilty.

9th. The prisoner is entitled to the benefit of every reasonable doubt, and if, after the entire comparison and consideration of all the evidence, the jury cannot say that they feel an abiding conviction to a moral certainty, that every essential element necessary to constitute guilt is proven beyond a reasonable doubt, then your verdict should be not guily.

10th. Proof beyond reasonable doubt must be made as to all facts necessary to make out the case of prosecution, and a reasonable doubt as to any fact necessary to a conviction should produce the defendant's acquital.

The following instructions, numbered as in the record, were requested by the defendant, but were refused by the court, and exception taken: 1st. If the jury find that the alleged killing was done more than two years previous to the filing of the indictment, and that it was done by an act imminently dangerous to others and evincing a depraved mind, but without any premeditated design to effect the death of any particular individual, then your verdict should be not guilty.

2nd. If the jury find that the alleged killing was done more than two years previous to the filling of the indictment, and that it was done in the heat of passion without design to effect the death of the person slain,

or the death of any human being, then your verdict should be not guilty.

3rd. If the jury find that the alleged killing was done more than two years previous to the filing of the indictment and done in the heat of passion, without a design to effect death by a dangerous weapon, then your verdict should be not guilty.

11th. The jury are the sole judges of the evidence and the weight of the evidence, and the jury are not bound to regard evidence even if it is undisputed, if in their minds it is not entitled to credit.

The two first errors assigned are, that the court erred in permitting the witnesses William Ray and Nancy Powell to testify as to the fact that the defendant, after slaying Margaret Welton, chased, shot at and threatened to kill, and tried to kill Nancy Powell. We do not think the court below erred in admitting this testimony. The proof is, that immediately after the defendant shot Margaret Welton, her mother, Nancy Powell, ran out of the tent begging him not to kill her child, or if he was going to kill her child, to kill her too, whereupon the defendant instantly turned upon her; when she ran he chased her to the tent of one John Taylor, where she took refuge, and where he was stopped from carrying out his murderous designs by Taylor with a musket. This evidence was proper because it may fairly be said to be a part and parcel of the same transaction in which Margaret Welton lost her life; and because it tends strongly to

show the vicious intent, the animus, by which the defendant was actuated in slaying the deceased. Nancy Powell in her evidence testified that before any of the shooting, when he first came into the tent that evening, before he began putting his murderous designs into execution by kicking her, he came in cursing, and then declared his intention to "kill two niggers that night." The testimony of these two witnesses objected to, when coupled with this previous threat, was particularly pertinent and proper, as it tended strongly to show premeditation in the killing of Margaret Welton; the immediate attempt, after killing her, also to slay her mother, furnishing a strong presumption that they were the two that he had premeditatedly determined to kill.

In State vs. Lapage, 57 N. H., 245, the following rule is approvingly cited from 1 Wharton's American Criminal Law : "So proof of a distinct murder, committed by the defendant at a different time, or of some other felony or transaction committed upon or against a different person and at a different time, in which the defendant participated, cannot be admitted until proof has been given establishing or tending to establish the offense with which he 'is charged, and showing some connection between the different transactions, or such facts or circumstances as will warrant a presumption that the latter grew out of, and was to some extent induced by, some circumstances connected with the

former as are calculated to show the *quo animo* or motive by which the prisoner was actuated or influenced in regard to the subsequent transaction are competent and legitimate testimony." Commonwealth vs. Tuckerman, 10 Gray (Mass.), 173; 1 Thompson on trials, sec. 330. We think the subsequent effort to kill Nancy Powell was so directly and intimately connected with the crime for which the prisoner was on trial that it was entirely proper to admit it for the purpose of showing the *animus* and intent of the defendant.

In the argument of the defendant's counsel to the jury he proceeded to "mention a case in that court about a year ago, where a negro was convicted on positive identification, and sentenced to be hung, and that subsequently positive evidence was discovered that the hour the crime was committed in Sanford, Florida, the negro was working in the kitchen for a white family in Tampa, Florida," which was objected to by the attorney for the State, upon which the court ruled out that part of the argument, and forbade further argument in that direction. This restriction of the argument of counsel is the 3rd error assigned. The ruling of the court in this respect was entirely proper. From the remarks being made by counsel as given in the bill of exceptions, he was stating facts that were not at all pertinent to the case on trial, and as to which there was not a word of evidence. Had the court ruled otherwise than he did upon this point, after objection was made, it would have been error. In Tucker vs. Henniker, 41

N. H., 317, the rule is stated with great force and accuracy as follows : "It is irregular and illegal for counsel to comment upon facts not proved before the jury as true, and not legally competent and admissible as evidence. The counsel represents and is a substitute for his client; whatever, therefore, the client may do in the management of his cause, may be done by his counsel. The largest and most liberal freedom of speech is allowed, and the law protects him in it. The rights of discussing the merits of the cause, both as to the law and facts, is unabridged. The range of discussion is wide. He may be heard in argument upon every question of law. In his addresses to the jury, it is his privilege to descant upon the facts proved, or admitted in the pleadings; to arraign the conduct of parties; impugn, excuse, justify or condemn motives, so far as they are developed in evidence; assail the credibility of witnesses, when it is impeached by direct evidence, or by the inconsistency or incoherence of their testimony, their manner of testifying, their appearance on the stand, or by circumstances. His illustrations may be as various as the resources of his genius; his argumentation as full and profound as his learning can make it; and he may, if he will, give play to his wit, or wings to his imagination. To his freedom of speech, however, there are some limitations. His manner must be decorous. So, too, what counsel does or says in the argument of a cause must be pertinent to the matter on trial before the jury, and he takes the hazard of its not being so. Now, statements of

facts not proved, and comments thereon, are outside of a cause; they stand legally irrelavant to the matter in question, and are, therefore, not pertinent. If not pertinent, they are not within the privilege of counsel." . Newton vs. State, 21 Fla., 53; 1 Thompson on Trials, sec. 965, and authorities cited.

The refusal of the court to give the first, second and third instructions requested by the defendant's counsel is also assigned as error. There was no error in the refusal to give these instructions, inasmuch as they were fully and substantially covered by the eighth instruction asked for by the defendant and given by the court. The indictment in this case being found more than two years after the commission of the offense charged therein, the object of these first three instructions was to have the jury told that if from the evidence they found the prisoner guilty of any lesser offense than murder in the first degree, it was their duty to acquit because all such lesser offenses were barred by limitation. This object is fully met in the eighth instruction in plain terms, and there was, therefore, no error in refusing to give the others that were the same in legal effect. Reddick vs. State, 25 Fla., 112.

The refusal of the court to give the eleventh instruction requested by defendant's counsel is also assigned as error. This instruction is fully covered and with more legal accuracy by the eigth instruction given by the court to the jury of its own motion. There was, therefore, no error in its refusal.

22

The refusal of the court to grant a new trial is also assigned as error. We have discused all the points made in the motion for new trial except the ground "that the verdict was contrary to the evidence." We have carefully considered the evidence and every part thereof, and our conclusion is, that it fully sustains the verdict of the jury. The proof by several eye-witnesses, without conflict and without any attempt at impeachment thereof, shows that the defendant, with a profane declaration upon his lips, "that he intended to kill two niggers that night," made an unproked and cowardly assault upon two defenseless women, killing one, and immediately proceeding to kill the other until prevented by another. His only attempt at defense was his own statement on the stand wherein he makes an effort to show a case of mistaken identity and to prove an *alibi*. His identity as the party who committed the crime is clearly made out by the evidence of five witnesses who had known him well for different periods of time, ranging from a few months to five or six years; one of them (Nancy Powell) having lived with him in the intimate relationship of a mistress for several years; and against this overwhelming testimony he puts his own highly interesting evidence alone. We see nothing in the record that calls upon us to disturb the finding of the jury.

The judgment of the court below is affirmed.