BILL MORRISON, PLAINTIFF IN ERROR, VS. THE STATE
OF FLORIDA, DEFENDANT IN ERROR.

Criminal Law—Charging in Writing—Utilizing Charges Given in
Another Case—Reiterating Charges Given—Charges to be
Given Literally as Written—Dying Declarations, Where There
are Several, any one or all Admissible—Appearances of Dan-
ger in Self-Defence.

1. Section 2920, Revised Statutes, provides that the charges of
the court to the jury in capital cases shall be wholly in writ-
ing, and section 1091, Revised Statutes, provides that such
charges shall be signed by the judge and be by him filed in
the case immediately after delivery or refusal, and form part
of the record in the case. When charges are given and filed
in compliance with these provisions of law, they become *a
part of the record in the particular case in which they are given*,
and trial judges should not withdraw them from the record of
the case of which they form a part, and make them by refiling
and interlineations a part of the record of another, different
and subsequent case.
2. Charges in writing should be given literally as they are writ-
ten.
3. Exceptions to the form or manner in which charges are given
should be seasonably made, at least before the rendition of the
verdict, otherwise objections thereto will be held to have been
waived.
4. Where a mortally wounded party, under a full appreciation of
his condition, with a full belief in the certainty of his imminent-
ly impending death, and without hope of recovery, makes sev-
eral complete statements at different times of the transaction
by which he received his wounds, any one or all of such com-
plete statements are admissible in evidence, and the State is
not confined to any particular one of them nor is it necessary
to offer all of the separate and distinct statements made at
different times in order to render other distinct declarations,
made at other times, admissible in evidence. Should any of
such several declarations be inconsistent or contradictory to
others made by the delcarent, it is open to the defence to
show the fact, and the burden upon the defence to show it
if it exists.
5. The following charge: "In considering and weighing the evi-
dence you should use the same judgment, reason, common
sense and general knowledge of men and affairs as you have
in every day life," held to be proper.

| 42 | 149 |
| 43 | 211 |
| 43 | 574 |

| 42 | 149 |
| 44 | 113 |
| e44 | 115 |
| 46 | 18 |
| j46 | 191 |

| 42 | 149 |
| 51 | 49 |

| 42 | 149 |
| 54 | 32 |
| 54 | 71 |
| f55 | 31 |
| 55 | 322 |

| 42 | 149 |
| 58 | 137 |

6. The appearances of impending imminent danger t one's life or limb must be such as would actuate a reasonable, cautious and prudent man, before they can excuse the giving of a mortal blow in self-defence.

7. A verdict convicting of murder in the second degree will not be set aside on the ground that the evidence does not make out that degree of the crime in terms as defined by the statute, if the evidence in the case would have supported a finding of murder in the first degree.

8. An indictment containing a single count charging murder in the first degree also contains a charge of murder in the second degree.

The majority of the court hold the evidence sufficient to sustain the conviction. (Taylor, C. J., dissents).

Writ of Error to the Circuit Court for Holmes County.

The facts in the case are stated in the opinion of the Court.

*D. L. McKinnon*, for Plaintiff in Error.

*The Attorney General*, for Defendant in Error.

TAYLOR, C. J.:

Under an indictment found in November, 1897, charging the plaintiff in error, jointly with three other parties, with murder in the first degree, the plaintiff in error was separately tried and convicted of murder in the second degree in May, 1899, in the Circuit Court of Holmes county, sentenced to life imprisonment and takes writ of error.

The errors assigned are as follows: 1st. The court erred in overruling the defendant's motion for a new trial, on the various grounds mentioned therein.

2nd. The court erred in denying the motion of the defendant in arrest of judgment.

The motion for new trial was upon the follolwing grounds:

1st. The verdict is contrary to law, the evidence and charge of the court.

2nd. The verdict is against the weight of the evidence.

3rd. The verdict is unsupported by the evidence, and without evidence to support it.

4th. The court erred in excusing two jurors for cause upon the challenge of the State for cause.

5th. The charge of the court was contrary to law.

6th. The court erred in refusing to give the special charges requested by the defendant numbered 1 and 3, and qualifying special charge 2.

7th. The court erred in not reducing to writing and filing the charge delivered to the jury as required by the statute.

8th. The court erred in permitting in evidence what purported to be a dying statement of deceased, as there was no evidence that the deceased believed himself beyond recovery, and because the evidence showed that there was a previous statement made by the deceased which was not produced.

9th. The court erred in charging the jury as follows: "In considering and weighing the evidence, you have and should use the same judgment, reason, common sense and general knowledge of men and affairs as you have in every day life."

10th. The court erred in charging the jury as follows: "But unless such belief of danger is reasonable, that is, unless a reasonably prudent and cautious man, would entertain the same belief, from the same appear-

ances it will be no defence, even though it was an honest belief of danger.   Men do not hold their lives at the mercy of the unreasoning fears, or excessive caution of others, and if from such motives the defendant killed Burnham without real or apparent good reason for so doing, he can not justify his act as being in self-defence."

The first, second and third of these grounds we will discuss last.

The fourth and fifth grounds have been abandoned here.

The sixth assignment involves the refusal to give as requested two instructions, and an alleged modification of a third instruction requested.   As to the instruction alleged to have been modified  from the  form in which it was requested, before being given by the court, there is nothing in the record to show that any change or modification was made by the judge in any requested instruction before giving same, therefore, this phase of the assignment must fail for the want of facts to make it appear.   In respect to the two instructions requested and refused, we find that the propositions announced in each of them had already been given in substance to the jury in other instructions, and there was, therefore, no error in their refusal.   Bryant v. State, 34 Fla. 291, 16 South. Rep. 177; Sherman v. State, 17 Fla. 888; Carter v. State, 22 Fla. 553; Killins v. State, 28 Fla. 313, 9 South. Rep. 711; Reddick v. State, 25 Fla. 112, 5 South. Rep. 704.

The seventh ground of the motion for new trial, to the effect that the court erred in not reducing to writing and filing the charge delivered to the jury as required by the statute, is predicated upon the following state of facts, as evidenced to us by the original

charges sent here for our inspection by special order of
the Circuit Judge: The Judge, instead of writing out
the charges in full and filing them in the record in this
case after having read them as written, simply took the
charges from the files in another case for murder that
had been tried a year or two  previously in the same
court, and after adapting them to this case, by interlin-
eations of the differing names of the deceased and of the
defendant, read such charges to the jury and then had
them refiled as part of the record in this case.   Section
2920 Revised Statutes provides that "the rules of law
relative to instructions and to the charge of the court in
civil cases shall obtain in all criminal cases, except as to
the charge in capital cases, which shall be wholly in writ-
ing and upon the law of the case only."   And section
1091 Revised Statutes provides that all instructions, as
well those given as those denied, shall be signed by the
judge, and be by him filed in the case immediately after
delivery or refusal and form a part of the *record in the
case.*   When charges are given and filed in compliance
with these provisions of the law they become *a part of
the record in the particular case in which they are
given,* and Circuit Judges should  not withdraw them
from the record of the case of which they form a part,
and make them by refiling and interlineations a part of
the record of another, different  and subsequent case.
The records of cases adjudicated in courts of record are
designed by the law to be permanent evidences of the
particular matters to which they speak, and the judges
of such courts have no right unnecessarily to break up
the continuity of the record in one case by unnecessarily
withdrawing a portion of such record and making it a
part of the record in a wholly different and subsequent
case, as appears to have been done in this case.   But

again, the charges here given were borrowed from a former case wherein one Padgett was the defendant on trial for murder and wherein one Henderson was the party killed. The borrowed charges made frequent mention of both of these names, and in adapting them to this case the judge very properly did not mutilate them by actually erasing such names but left them in the charges wherever they occurred, but interlined over them throughout the names respectively of the defendant and the deceased in this case, so as to adapt them to this case. Our statute requires the whole charge in capital cases to be in writing, and we think the correct rule is that it should *be given literally as it is written.* Dixon v. State, 13 Fla. 636; The Rising-Sun and Versailles Turnpike Co. v. Conway, 7 Ind. 187. Suppose in the present case the latter rule had been observed, and these borrowed charges had been *given literally as they were written,* we would have had the anomaly of a set of instructions making repeated reference to two differently named individuals as defendant, one of whom was in no way conected with the case, and to two differently named individuals as the deceased, one of whom was likewise a stranger to the case on trial. Had the manner in which these charges been given to the jury been seasonably excepted to we would have been called upon to adjudge whether or not it was *reversible* error; but as it was not excepted to promptly, at least before the rendition of the verdict, such exception being taken for the first time after verdict in the motion for new trial, we will have to adjudge the error, if any, to have been waived. Hubbard v. State, 37 Fla. 156, 20 South. Rep. 235; Southern Express Co. v. VanMeter, 17 Fla. 783; Potsdamer v. State, Ibid. 895.

At the trial the judge admitted in evidence a paper

writing in the form of an affidavit sworn to by the deceased, and offered as the dying declaration of the deceased; its admission was excepted to and is assigned as error. The objections urged at the trial to its introduction were that it had been shown by the State's witnesses that the deceased had made another statement in writing prior to the one offered, and that the one offered should not be received in evidence because the first one made by the deceased was not produced, nor its absence accounted for, and that if produced it might contradict the statement offered, and because the evidence does not show that the deceased when he made the statement offered, believed that he was beyond hope of recovery. The first of these objections is untenable. A party mortally wounded may before death, under a full appreciation of his condition, and with a full belief of the certainty of his impending death, make several complete statements at different times of the transactions by which he received his wounds, and in such case the State could offer any one or all of such complete statements, and would not be confined to any one of them; nor would it be necessary to offer all of the separate and distinct statements made at different times, in order to render other distinct declarations made at other times admissible in evidence. It was open to the defence to show that the deceased had made inconsistent or contradictory statements in reference to the transaction, and the burden was upon him to show the fact if it existed. The second ground of objection to the admission of such dying declaration is not supported by the record. We think it is sufficiently shown from the record that the deceased at the time he made the statement received in evidence, had lost all hope of recovery and fully appreci-

ated the certainty and imminence of his impending death, so as to make such statement admissible.

The giving of the following charge is also assigned as error: "In considering and weighing the evidence you have and should use the same judgment, reason, common sense and general knowledge of men and affairs as you have in every day life." There was no error in giving this charge. It stated the law correctly. Rex v. Rosser, 7 Car. & P. 648 (32 Eng. C. L. 670); Johnson v. Hillstrom, 37 Minn. 122, 33 N. W. Rep. 547; Kitzinger v. Sanborn, 70 Ill. 146; Dunlop v. United States, 165 U. S. 486, 17 Sup. Ct. Rep. 375; Sanford v. Gates, 38 Kan. 405, 16 Pac. Rep. 807; Rosenbaum v. State, 33 Ala. 354; Schmidt v. New York Union Mutual Fire Ins. Co., 1 Gray 529; Jenny Electric Co. v. Branham, 145 Ind. 314, 41 N. E. Rep. 448.

It is next contended that the following instruction given by the court was erroneous. "But unless such belief of danger is reasonable, that is, unless a reasonably prudent and cautious man would entertain the same belief from the same appearances, it will be no defence, even though it was an honest belief of danger. Men do not hold their lives at the mercy of the unreasoning fears, or excessive caution of others, and if from such motives the defendant killed Burnham without real or apparent good reason for so doing he can not justify his act as being in self-defence." The contention is that the charge erroneously requires the appearances of impending imminent danger to life or limb to be such as would actuate a reasonable, cautious and prudent man before they can excuse the mortal blow. This contention is untenable, and the propriety of the charge is fully sustained by the cases of Smith v. State, 25 Fla. 517, 6 South. Rep. 482; Pinder v. State, 27 Fla. 370, 8 South.

Rep. 837, and Padgett v. State, 40 Fla. 451, 24 South. Rep. 145.

We now recur to the first three grounds of the motion for new trial, to the effect that the verdict is contrary to law, the charge of the court and the evidence, and is unsupported by the evidence. The verdict found the defendant guilty of murder in the second degree. Our statute (§2380 Rev. Stats.) defines murder in the second degree as follows: "The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another, and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, it shall be murder in the second degree." Chapter 4392 Laws, approved May 30th, 1895, provides as follows: "That in all criminal prosecutions hereafter begun in this State, if the defendant be found guilty of an offence lesser in degree, but included within the offence charged in the indictment or information, such verdict shall not be set aside by the court, upon the ground that such verdict is contrary to the evidence, if the evidence produced in such case would have supported a finding, or if such court would have sustained a verdict of guilty of the greater offence." Under the provisions of this last mentioned statute in the investigation of the question as to whether the verdict found is supported by the evidence or contrary thereto, the enquiry will have to include, not alone whether the second degree of murder as found is in terms supported by the evidence, but also whether such evidence was enough to sustain the higher phase of the same crime defined as murder in the first degree. Brown v. State, 31 Fla. 207, 12 South. Rep. 640; Marshall v. State, 32 Fla. 462, 14 South. Rep. 92; McCoy v. State, 40 Fla. 494, 24 South. Rep. 485. The

substance of the evidence for the prosecution was as follows:  Dr. R. M. Anderson testified that he was a practicing physician, and as such went to see the deceased about ten o'clock in the morning of the next day after he was shot; that he had gunshot wounds in the stomach, jaw and arm and was practically in a dying condition; that he thought the wound in the stomach was sufficient to produce death, and that in his opinion he died from those wounds.  He did not  remember that deceased made  any statement as to who  inflicted  the wounds, and  that he did not hear him  say that he thought he would die from the wounds.

P. G. Woodruff testified that he was a minister of the gospel and went to see the  deceased about ten o'clock p. m. on the day he was shot, and again about eleven o'clock the next morning; that he saw that he was very seriously wounded, and thought he would soon die.  The deceased told him that he thought so too, that he had no hope of living, and asked that his mother be sent for, and made his arrangements to die.  Here what purported to be the dying declaration of the deceased was handed him, and he testified:  This is the second statement the day after the difficulty.  This is the only statement that I ever saw or heard him make.  I heard he made one the night before, but I don't know that of my own knowledge.  This statement I heard him make only a short while before he died.  He seemed to be in great pain, and they were giving him some sort of medicine that night and next  morning, but what it was I don't know.  I supposed it to be some sort of opiate to relieve his pain and produce sleep.  It was after the medicine was given that he made this statement.  I can not say whether he was under the influence of the medicine and his mind affected by it or not, he seemed to be

perfectly rational and his mind clear. I do not know what became of the first statement, nor why the second was taken.

John W. Hawkins, after being shown the same statement, testified: I wrote this statement in the room with the deceased. I wrote another one before this one but don't know where it is. I gave it to my father, then I wrote this statement just as he stated it to me in his own language. I read it over to the deceased after I wrote it, and he said that it was correct. He seemed to be in about the same condition when both statements were written. Don't remember what, if there was any, difference between them. Can't say whether or not he was under the influence of opiates, or his mind affected when he made either of the statements.

The said statement was then admitted in evidence as follows:

"In the County Judge's Court of Holmes County, Florida.

State of Florida, Holmes County.

Before the subscriber, W. M. Hawkins, County Judge in and for the county of Holmes and State of Florida, aforesaid, personally appeared J. M. Burnham who, after being duly sworn, says on oath that I was in the bar-room when Mr. Billie Morrison came in and began to talk to me. I started out and met Bill Morrison and John Sellers, when each of them taken me by the hand and Morrison asked me what was I a-singing this morning, and I told Morrison and Sellers I was singing 'There is nobody waiting for me.' Billie Morrison and John Sellers taken hold of me and said that I must not be singing any more about here. Billie Morrison made an attempt like he was a-going to fight me, and I jerked loose from John Sellers and shoved Billie Morrison

down, and I saw Billie Morrison start like he was going to get his pistol, and I did not know which pocket it was in and before I could get a hold of the pistol he (Billie Morrison) shot me. The first shot taken effect through the stomach, and the second was in the face, and the third shot hit me in the arm and broke and shattered said right arm. He, the said Billie Morrison, shot at me another time in the house; the last shot missed me. There was four shots fired in the house. After the fourth shot we ran out of the bar-room of S. F. Moore in the town of Westville; he, Billie Morrison, or some one else, fired two or three shots at me outside of the above described bar-room. I do not know who it was outside of the above described bar-room that was a-doing the shooting at me, as it was in the dark and I could not tell for certain who it was, as it was in the dark, and I could not tell for a certainty. I never shot at Billie Morrison, nor never had any gun or pistol to shoot at him with. One Mr. Sanford handed me a pistol before any row occurred, and some of the boys told me to carry it off home with me, but I gave it back to Fletch Moore or Mr. Sanford before there was any words passed between me and Billie Morrison, or before I thought of any trouble or difficulty of any kind.

(Signed)                    J. M. Burnham,

By Jno. W. Hawkins.

Witnesses: C. E. Darby, P. G. Woodruff.

Sworn to and subscribed before me, this the 23rd day of September, A. D. 1897.

(Signed)      W. M. Hawkins, County Judge."

S. F. Moore testified as follows: The difficulty between the deceased and the defendant took place in my

saloon in Westville, Holmes county, Florida, on the evening of the 22nd September, 1897, and the deceased died in Westville the next day. I saw a portion of the difficulty, but did not see how it started, or who struck the first lick, as there was a blind door between them and myself when it began; but immediately after I heard the noise at the door the blinds flew open and both parties clinched came in so that I could see them plainly. As soon as they were inside, the deceased threw the defendant to the floor on his back, holding on to one of the defendant's legs or foot and began stamping or kicking him about the breast or head with his foot, while defendant seemed to be trying to ward off the kicks and get up. After some considerable struggling there was a pistol fired apparently by the defendant who was on his back on the floor with the deceased holding his leg or foot and was kicking or stamping him. I then dodged under the counter, and saw no more of it until it ended. Then the deceased come walking back into the saloon, but against the counter and fell to the floor. I did not see any pistol in the hands of the defendant when they came through the door clinched, nor did I see any knife in the hand of deceased. Some one picked up the pocket book and knife of the deceased off of the floor where they were scuffling and handed them to me that night. The knife was shut when it was handed to me, but can not say whether or not it was open when it was picked up. I think there were three or four pistol shots fired while the defendant was on the floor and one fired just as they went out of the door. The defendant had been in my saloon off and on all the evening. The deceased had been there about an hour. The defendant had told me about the threats the deceased had made against him and about his singing a vulgar song pass-

ing by his house that morning. The deceased came in
and spoke friendly to the defendant. In a few minutes
I saw the defendant and Sellars go out, and thinking
they might have a difficulty with deceased, I told them
that the deceased seemed to be friendly, and I hoped
they would not have any trouble, especially in my sa-
loon. I saw no demonstration on the part of either un-
til the difficulty began. The deceased was a much larg-
er and stronger man than the defendant, and seemed to
handle the defendant without difficulty. /I had frequent-
ly heard of the threats of the deceased against the de-
fendant for marrying his former wife, not only from the
defendant, but various parties for quite a while before
the difficulty. The defendant is a small man, consider-
ably below the medium in size, while the deceased was
full or above medium in size.

W. N. Holstead testified as follows: The defend-
ant told me the day the deceased was shot that he was
in trouble and expected to be in a great deal more by
that night. Did not say what the trouble was about or
with whom he expected more trouble. He made no
threats against anyone, and did not mention the de-
ceased man at all.

Dr. W. J. Lee testified as follows: I am a practic-
ing physician, and as such was called to see the deceased
the night he was wounded. He was wounded in the
stomach, face and shoulder. In my opinion the wound
in the stomach killed him. I prescribed such medicine
only as I thought would relieve his pain and induce
sleep. Don't remember now exactly what I did pre-
scribe. He seemed to be in considerable pain.

Wm. Cunnys testified as follows: The defendant
came to my place the night of the difficulty after the
killing and called me out and wanted to borrow my gun.

I started to get it for him, when he said I suppose you know I killed Burnham a while ago. I then refused to let him have the gun. I did not ask, nor did he tell me, the cause of the difficulty.

D. J. Paulk testified as follows: I am and was the sheriff of Holmes county, Florida, at the time the deceased was killed. The defendant came and gave himself up to me as sheriff the next day after the difficulty. I had no warrant at the time. I put him in the county jail and he remained there until he and others broke jail. I afterwards arrested him at Fernandina, Florida, where he had joined the United States army. I do not now remember what he said at the time when he gave himself up about the killing.

Sam Cooey testified as follows: I do not remember what the defendant said about killing the deceased. No, I can't remember anything about it now. Yes, he said something about it, but I forgot what it was. Question by State Attorney: Did you not tell Mr. Parrott here on yesterday that you heard the defendant say that he came here to kill the deceased and did it? Yes, I told him so. Q. State whether the defendant did, or did not say so? Yes, he told me so; it was just before or after last Christmas. Cross-examined: Q. When were you summoned in this case? I was summoned yesterday. Q. To whom and when did you first tell this? Mr. Parrott there was the first one I told it to, and only told him yesterday. Q. How came you to tell him yesterday? Because he asked me about it. Q. Was there anyone present when the defendant made the remark, but you and him, that heard it? No, there was no one. Q. Then how did Mr. Parrot know that you knew anything about it, so as to come and ask you about it, if you had never told anyone else? I don't

know, he just asked me and I told him. Q. Why did you say, when the State Attorney first questioned you, that you did not know what the defendant said, and that you could not remember, if you told Mr. Parrot yesterday? I did not remember it then. Q. Did you not know that Mr. Parrot was a relative and friend of the deceased, and was active in prosecuting the defendant for killing him? Yes, I knew he was. Q. Have you not seen Mr. Parrot frequently since last Christmas, before yesterday; and you never mentioned the conversation to him or anyone else until yesterday, and not then until he asked you about the conversation? No, I never mentioned it to anyone until yesterday when I told Mr. Parrot, as I said; and I have seen Mr. Parrot several times since, before yesterday. Here the State rested.

Testimony for the defendant.

D. L. Morrison testified as follows: I am the wife of the defendant. I was several years ago married to the deceased, but he treated me so badly I was forced to separate from him and obtain a divorce after being separated from him a year or so, and soon afterwards married the defendant. The deceased was a very violent and dangerous man, and frequently told me that if I quit him and got a divorce he would see that no other man should live with me as a wife; that if he could not enjoy me no other man should. He kept threatening and slandering me, even after I got a divorce. The morning of the difficulty he passed right in front of our house where me and my husband was, singing a very vulgar song. The words were too vulgar for a lady to repeat and I don't want to repeat them. The State Attorney insisted that she give the words as near as possible, but the court ruled that she need not if they were too vulgar.

Henry Morrison testified as follows: I am the uncle of the defendant. One day here in Westville I saw the deceased reach at the defendant, just as he came out of a store-house, making a demonstration as if he were about to draw a pistol, cursed and abused the defendant, "what are you having them damn lies sworn against me for?" The defendant kept out of his way and said "I have not had any lies sworn against you, and I wish you would let me alone." The deceased said "yes, you have, and I will get you for it yet." The defendant went to Mr. Parrott, a friend and relative of the deceased, and asked him to talk to the deceased and make him stop threatening and interfering with him. Mr. Parrott replied that it was no use; that the deceased thought that he knew more than he did, and would pay no attention to him. The defendant had not even spoke to the deceased when he rushed at him as I have stated.

Jerry Day testified as follows: I heard the deceased say twice that he was going to kill the defendant because he did not intend that any man should enjoy the woman that he had once had for a wife, if he could not. The first time he made the threat was two or three weeks before he was killed, and I went to the defendant and told him of it, and also told him to be on the lookout. The next time was the evening of the difficulty. He said he heard that the defendant was in town and he intended to get him that evening or night. I did not tell the defendant of this last threat, as I did not see him before the difficulty took place. He asked me if the defendant was in town. That was as he was coming in town late in the evening, and I was going out home.

Teny Blackman testified as follows: On the evening of the difficulty I saw the deceased on his way to

Westville, and he told me that he was going to kill the defendant that evening or be killed, and for me to come down to see the fun. I did not communicate this to the defendant before the difficulty, as the difficulty occurred a short time after he told me, and I did not see the defendant to tell him. .

Bill Cooey testified as follows: I heard the deceased say several times on different occasions that he intended to kill the defendant, as no damn man should live with his wife. I told the defendant of the threats before the difficulty.

Joe Simmons testified as follows: I heard the deceased say twice that no one should ever enjoy his wife if he could not. That if it was not for the law neither the defendant nor his father-in-law, Hewitt, would live until morning. I told the defendant of these threats, and also Mr. Hewitt, before the difficulty. The deceased was a bad, desperate and dangerous man, and much stouter than the defendant. I was at the saloon where the difficulty occurred immediately after it occurred, and picked up off of the floor in front of the counter the deceased's pocket book and knife and handed them to Mr. Moore, the saloon keeper. The knife was open when I picked it up, and I shut it before handing it to Moore as soon as I picked it up.

James Cooey testified as follows: I heard the deceased say some time before the killing that neither the defendant nor any one else could live with his wife. This was after she was divorced from him and had married the defendant. Do not remember that I ever told the defendant what he said.

Robert Burke testified as follows: A short time before the death of the deceased he and I were standing and talking togther when the defendant passed by. The

deceased remarked "there goes a durned scoundrel; he
married a woman that was mine; and God-damn him, I
don't intend that he shall enjoy her." I told the de-
fendant of this remark, that evening just before the dif-
ficulty occurred.

John Braxton testified as follows: I heard the de-
ceased say a short time before the killing that no one
should live with his wife. This was after she had been
divorced from him and had married the defendant. The
deceased was a very bad, dangerous man, and was much
stouter than the defendant.

W. M. Sassanett testified as follows: As I was
leaving Westville on the evening of the difficulty, I met
the deceased coming to Westville. He said that he ex-
pected to have trouble that night; he also said that he
thought the defendant was in town. He did not say
with whom he expected to have the trouble, but as he
mentioned the defendant, and I had heard of his threats
before, I supposed he meant with the defendant. I did
not see the defendant before the difficulty, to tell him of
it.

John Sellers testified as follows: I was present
when the difficulty began between the deceased and the
defendant. The defendant and myself were standing just
outside of the blind door of the saloon talking when the
deceased came out of the saloon through that door.
Just as he was about to pass us he saw the defendant;
he turned to him and said "how did you like that song I
sang this morning?" The defendant replied that he
"did not like it, and wished he would not sing it again in
the presence or hearing of my wife." The deceased said
"you have a damned poor way of helping yourself," at
the same time rushed at the defendant, striking him and
jerking him inside of the saloon. I caught hold of the

deceased's arm and tried to stop him, but he jerked loose and threw the defendant on the floor in front of the counter, and I did not interfere any more. After the deceased threw the defendant on his back on the floor, he took hold of one of his feet and seemed to be stomping him in the breast or face while the defendant was struggling to prevent it, and trying to get up. After they had been struggling there for a little while, and the defendant still on his back, a pistol shot was fired, I supposed by the defendant, but in the confusion and struggling I could not state positively that he fired it. The defendant did not have any pistol in his hand when the difficulty began. I am sure of it because I was right at him and would have seen it. I was in touching distance of both of them. I know the deceased struck the first lick, grabbed the defendant and threw him on his back to the floor; and I am sure the difficulty started just as I have stated, by the deceased asking the defendant how he liked that song. The defendant made no threat or demonstration to strike the deceased, before the deceased struck and grabbed him. When the firing began I stepped back outside and could see them very well. There were four or five shots fired, one of them at the door just as the defendant ran out and the deceased right after him. I saw something like a knife in the hand of the deceased during the difficulty. I went to the saloon from the livery stable. I go there frequently; nearly every night.

Julius Cooey testified as follows: I was present at the saloon the night the defendant and the deceased had the difficulty. I did not hear the first that was said by either party, when the difficulty began, as I had just started in the saloon. There is an outer door, and a blind door just inside of the saloon. Just as I came up I

saw the deceased, defendant, and John Sellers, who has just testified, standing sorter between the blind door and outer door, close together. The first thing I heard was the deceased said "you have a poor way of helping yourself," at the same time rushed at, struck the defendant and they clinched. The deceased then threw the defendant through the blind door on the floor on his back, had him by one foot or leg and seemed to be stomping or kicking him in the breast or face while the defendant was struggling to prevent it and trying to get up. After they had been struggling for a little while and the defendant still on his back, I heard a shot which I supposed was fired by the defendant. Then three or four shots were fired in rapid succession, but I could not say who fired them. There were others in the saloon, but I did not see them while the firing was going on. The last shot was fired at the door as the defendant ran out, the deceased right after him. The deceased then stopped, went back into the saloon and fell. The defendant went on off somewhere; can't say where.

W,m. Morrison testified as follows: I am the defendant in this case. My wife who testified today was once the wife of the deceased. After she had separated from him a year or so, and had obtained a divorce, I married her, as I thought I had a right to do so. Ever since then the deceased has been mad with me, and has not only tried to provoke difficulties with me, but has threatened my life to other parties who came and told me of it. Therefore, it was my purpose to avoid a difficulty as far as possible, but under the advice of friends, I tried to keep prepared to defend myself, as I knew he was a dangerous man, and much stronger than I was. Except to marry the woman that was once his wife, I never gave him any cause to dislike me, and told him on the

occasions testified about by my uncle, Henry Morrison, that I had nothing against him, and wished he would let me alone, as I had never done him any harm. At the time he assaulted me, that my uncle testified about, I had not said one word to him. And I asked Mr. Parrott, whom I thought had more influence with him than any one else, to go and talk to him and tell him that I had not gotten any one to swear lies against him, as he said I did on that occasion, or done him any harm whatever. Mr. Parrott said that it was no use, that he thought he was a bigger man than anybody else. A great many people came to me and told me of his threats, and advised me to be on the lookout for him, as he was a desperate man. The very evening of the difficulty Rob. Burke came to me and told me that he had threatened my life for marrying his former wife. The statements made by John Sellars and Julius Cooey as to how the difficulty began, is substantially correct, to the best of my recollection. I made no threat or effort to do him any harm until he struck and grabbed me as they have stated. Then I did all I could to avoid killing him, but he had me down on my back stomping and kicking me, and then took out his knife, when I thought sure he would kill me; I pulled my pistol and shot at him three times while I was down on the floor and he holding my leg and kicking and stomping me and trying to cut me. I fired one shot just as I got up, and the last one just as I went out of the door over my shoulder while he was cutting at me. I did not stop or turn as I fired the last shot, as I felt him cut my coat and I got out as fast as I could. (Exhibiting the coat to the jury he said:) There are the cuts he made in my coat, but they did not reach to the skin, and except by feeling my coat jerk as I went out of the door and fired

the last shot, I did not know that he had cut my coat until afterwards, but am satisfied that the cut behind was made just as I passed out of the door and felt my coat jerked, when I fired the last shot over my shoulder without turning or stopping. I was ready to start home, and was going back in the saloon to get a piece of beef that I had bought that evening, and had laid on the head of a barrel in the saloon, when he met me at the door. As he pretended to be friendly when he first came in the saloon that evening and spoke to me I did not expect any difficulty then, although I had been informed of his threats. He passed my house that morning singing a very vulgar song in the hearing of my wife, but I did not say a word to him as I wanted to avoid trouble, although it was very provoking and insulting. I felt certain that he did it for the purpose of provoking a difficulty with me so that he might have an excuse to kill me. We had never had any trouble before I married his former wife. I had started home, but remembered the beef that I had left in the saloon, and was going back to get it and met John Sellars just in the door and was talking to him, when the deceased was about to pass out, but stopped and asked me how I liked that song he sang this morning. I replied that I did not like it, and wished he would not sing it again while he was passing my house. He said I had a damned poor way of helping myself, then struck and grabbed me, just as has been stated. When I shot him I thought my life was in imminent danger, and everything I did I thought was necessary to save my life. I saw the knife in his hand. I think I shot three times when he had me down on my back, once as I ran, and the last as I was going out of the door and he after me. I stayed in town sometime afterwards and then went

out home.  After I learned what had been done, next
day I went to Mr. Paulk and gave myself up to him,
stating in substance to him that what I did was only to
defend myself.  He put me in jail where I remained until
next term of court and an indictment was found against
me, and the case continued until the next term of the
court on account of the absence of witnesses.  I could
not give the bond the court required me to give, and I
did not know when I would get a trial, and I broke out
of the jail and joined the United States army at Fer-
nandina, Florida, and was there when re-arrested by the
sheriff, Mr. Paulk.  I positively did not state to Sam
Cooey or any one else that I had come down here to
kill the deceased and did it, as he has testified, either at
the time and place or anywhere else.  No such conver-
sation ever ocurred between us, and I never heard of it
until he testified to it today.  His statement is abso-
lutely false from beginning to end.  I did not have any
arrangement with John Sellars, the Cooeys or any one
else, to assist me with any difficulty that night.  I did
not know that the deceased was in town that night un-
til he spoke to me in the saloon that night, apparently
friendly.  I fired all the shots that were fired; and I ver-
ily believed at the time, and still believe, that my life was
in imminent danger when I fired them.

The defence having closed, the State recalled S. M.
Moore, a State witness, who testified in rebuttal, as fol-
lows:  I do not think there were more than two or three
pistol shots fired while the defendant was down on the
floor, as well as I could judge.  I know that he was
down on his back with the deceased holding his foot or
leg when the first shot fired, and the next two or three,
or it may be more, were fired in rapid succession; but as

I had squatted behind the counter after the first shot, I could not state positively as to the others.

D. M. Martin for the State, in rebuttal, testified as follows: I was a short distance from the saloon when the difficulty between the defendant and the deceased occurred, and heard some pistol shots in the direction of the saloon which attracted my attention. Directly I saw the flash of two pistols about the door of the saloon, but could not say whether they were inside or outside of the door. I only saw the flash of the pistols, but could not say who fired them, or in what direction they were fired, as it was dark.

It will be seen from this testimony that it does not make out in terms the specific phase of the crime of murder defined as murder in the second degree. The next inquiry is would the evidence have supported a verdict for murder in the first degree? The writer is of the opinion that it would not; but, on the contrary, thinks that if there ever was a case of self-defence that merited, not only the fullest sanction, but the commendation of the law, the facts here present such a case. The majority of the court, however, think otherwise, and are of the opinion that the *ante mortem* statement of the deceased, together with other testimony in the case tends to show that the defendant unnecessarily brought on the difficulty that led to the tragedy, and that had the verdict been for murder in the first degree, it could not have been disturbed because of the tendency of the testimory to show that the defendant provoked the difficulty for the purpose of killing the deceased.

The second assignment of error questions the ruling on the defendant's motion in arrest of judgment made upon the grounds, in substance, that the indictment, charging murder in the first degree, did not

charge the crime of murder in the second degree of which he was convicted. This contention is settled adversely to the plaintiff in error in the case of McCoy v. State, 40 Fla. *supra*, and authorities there cited.

The judgment of the court below is hereby affirmed.